Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

Aimee Wagstaff (SBN 278480)
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, CO 80203
Telephone: (303) 376-6360
awagstaff@wagstafflawfirm.com

Roopal P. Luhana
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

*Co-Lead Counsel for Plaintiffs*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: LYFT, INC. PASSENGER SEXUAL ASSAULT LITIGATION | Case No. 3:26-md-03171-RFL<br><br>**JOINT LETTER REGARDING NON-CUSTODIAL SOURCES**<br><br>Judge: Hon. Lisa J. Cisneros |

Dear Judge Cisneros:

The parties respectfully submit this joint letter regarding Lyft's identification of non-custodial sources pursuant to Paragraph 7 of the Court's ESI Order [Dkt. 297].

Dated: October 26, 2026

Respectfully submitted,

*/s/ Aimee Wagstaff*

Aimee Wagstaff (SBN 278480)
**WAGSTAFF LAW FIRM**
940 N. Lincoln Street
Denver, CO 80203
Telephone: (303) 376-6360
awagstaff@wagstafflawfirm.com

Roopal P. Luhana (admitted *pro hac vice*)
**CHAFFIN LUHANA LLP**
600 Third Avenue, 12th Floor
New York, NY 10016
Telephone: (888) 480-1123
luhana@chaffinluhana.com

Rachel B. Abrams (SBN 209316)
**PEIFFER WOLF CARR KANE CONWAY & WISE, LLP**
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

*Co-Lead Counsel for Plaintiffs*

*/s/ David Riskin*

Kristen L. Richer (SBN 315883)
Sandra M. Ko (SBN 260863)
**BARNES & THORNBURG LLP**
2029 Century Park East, Ste. 300
Los Angeles, CA 90067
Telephone: (310) 284-3880
kricher@btlaw.com
sko@btlaw.com

*Defense Liaison Counsel and Counsel for Defendant Lyft, Inc.*

Nadine S. Kohane (admitted *pro hac vice*)
**BARNES & THORNBURG LLP**
390 Madison Ave., 12th Floor
New York, NY 10017
Telephone: (646) 746-2000
nkohane@btlaw.com

Beth A. Stewart (admitted *pro hac vice*)
David Randall J. Riskin (admitted *pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
bstewart@wc.com
driskin@wc.com

*Counsel for Defendant Lyft, Inc.*

**Plaintiffs' Position**

The identification, description, and location of Lyft's non-custodial data sources is foundational both to this litigation and, presumably, to Lyft's routine business operations. Despite Court Orders, numerous requests from Plaintiffs, and multiple meetings between the parties, Lyft continues to provide untimely, incomplete, and vague information about this discovery requirement. Lyft has not provided a valid explanation for its deficiencies. Its ongoing deficiency severely hampers timely discovery and jeopardizes the Court's discovery schedule. Plaintiffs therefore ask the Court to order Lyft to comply with its obligations under Paragraph 7 of the ESI Order [Dkt. 297] within three (3) days and to certify under oath that the information is complete and accurate. Lyft raises complaints regarding the PTO 18 process; however, the parties have been meeting and conferring on these and other issues for months. *See* Declaration of Tiffany Ellis (**Ex. 1**)

**I. Proper Identification and Discovery of Non-Custodial Sources is Critical and Must Be Fulsome and Transparent.** Large international companies like Lyft require a variety of general documents and sources to exist and operate. It is axiomatic that information like human resources policies, financial data and reports, safety procedures, operations checklists, and marketing materials exist within any company's files – usually, in one or more centralized repositories accessible by many or all company employees. Lyft maintains broad access data sources that are fundamental to Plaintiffs' claims; for example, policies and standards regarding driver conduct, data regarding rider complaints and their resolution, ride and GPS data, processes for onboarding, evaluating, disciplining, and/or deactivating drivers, marketing strategies for attracting women riders, and safety data and statistics, to name just a few.

But since the inception of this litigation, Lyft has downplayed and obscured the existence, location, and structure of these sources. Lyft instead insists that it cannot provide a generalized contents list or folder structure for such data because, according to Lyft, the vast majority of documents sought by Plaintiffs are housed in individual employees' files and should be obtained by Plaintiffs through the custodian and search term process. Leaving aside that this "hit or miss" approach violates Defendant's basic discovery obligations, Lyft's position also violates the Court's Order to clearly identify these non-custodial sources to Plaintiffs.

**II. The Substance of Lyft's Obligations to Disclose Non-Custodial Sources is Clear.** Lyft's obligation to provide Plaintiffs with timely non-custodial source information is clear. Paragraph 7 of the Court's ESI Order states in relevant part that "[t]o the extent they have not already done so, within 7 business days of the entry of this Order, Defendant will disclose…(b) the specific names of custodial and non-custodial data sources in Lyft's possession, custody, and control likely to contain potentially relevant Documents and ESI and the exact information each source includes…". [Dkt. 297]. The Order goes on to identify in great detail potential sources of non-custodial documents, and further states that "[i]nformation that serves to identify or locate such material, such as file inventories, file folders, indices, and metadata, are also included in this definition." Id. Through this clause, the Order unambiguously requires Lyft to produce not only the name and description of non-custodial sources, but also to produce any information that could lead to the location of those sources.

Even prior to the Order's entry, the Court stated: "I would want Lyft to provide a chart, kind of like what was done with the metadata but with respect to the custodial and non-custodial sources of information; lay out what they think some particular element of it, it's been disclosed or

not disclosed; it will be disclosed by a date certain. And then plaintiffs could respond like, 'They say they've disclosed it, but that's not actually the reality of it.'" June 23, 2026 Hr'g Tr. at 22:12-17. Through both the ESI Order and its explicit direction, the Court has clearly articulated the extent and form of how non-custodial sources must be identified. Lyft's repeated failure to meet this Court's Order prejudices Plaintiffs' ability to properly engage in discovery.

**III. Lyft Has Repeatedly Failed to Comply with its Discovery Obligations.** Lyft provided partial disclosures of non-custodial sources to Plaintiffs on May 20, June 3, and June 25 (Dkt. #232-3). Those disclosures identified potential non-custodial sources in extraordinarily vague terms – for example, [redacted] Other than reciting this broad swath of information the identified source might contain, Lyft did not produce any explication of "the exact information each source includes…" as required by the ESI Order. Yet despite these deficiencies, following entry of the ESI Order, Lyft never updated its disclosures to provide the required detailed description or to add any new data sources. Instead, on July 24, 2026, Lyft certified to Plaintiffs that it was in full compliance with Paragraph 7 by way of its prior disclosures.

That representation was false. Since July 24, and only when pressed by Plaintiffs, Lyft began to identify non-custodial sources highly relevant to this litigation that were never previously disclosed. By way of example, in late August, 2026 – approximately one month after it represented that its disclosures were complete – Lyft for the first time revealed to Plaintiffs [redacted] Plaintiffs had never before heard of either of these critical data sources, despite months of inquiry to Lyft.[1]

Lyft's attempt to characterize [redacted] and [redacted] as merely tools rather than data repositories misses the point. Regardless of where the underlying data is stored, these tools [redacted] Identifying only [redacted], without explaining these tools and their relationship to the underlying data, does not provide the meaningful disclosure required by Paragraph 7 of the ESI Order.

**IV. Lyft Continues to Divulge Piecemeal Information.** The [redacted] disclosure issue is deeply concerning to Plaintiffs. Lyft's safety data, and where and how it is stored, is critical to Plaintiffs' claims. Plaintiffs continue to request answers from Lyft about the safety data storage systems and how they interact with Lyft's other systems, such as [redacted] Plaintiffs' inquiries are met with non-responses, statements that Lyft continues to "look into" the issue, and deflection. Despite the straightforward nature of these questions, Lyft continues to withhold a complete explanation of where the sources are stored and how they interact with each other.

Similarly troubling is Lyft's recent reversal of its long-held position that the company does not maintain substantial non-custodial data sources at all, and that the vast majority of responsive documents are custodial in nature. During a meet and confer about Lyft's written discovery responses held on October 10 – nearly three months after Lyft certified it had disclosed all responsive information about non-custodial sources – Lyft, for the first time, advised Plaintiffs that [redacted] Lyft

---

[1] It is also notable that throughout the many years of discovery in the JCCP, Lyft never identified these sources to counsel in that litigation either.

has yet to provide Plaintiffs with [redacted]

Lyft cannot excuse these deficiencies by invoking the ESI Order's iterative discovery process. Although supplementation is contemplated, that does not relieve Lyft of its obligation to provide complete and accurate disclosures based on a reasonable investigation. Lyft's belated identification of critical safety systems months after certifying compliance demonstrates that its initial disclosures were inadequate.

Nor does Lyft's identification of [redacted], and other individual systems establish compliance. Paragraph 7 expressly requires disclosure of the "exact information each source includes," not merely the identification of systems by name. Lyft's piecemeal disclosures continue to leave Plaintiffs without a complete understanding of where relevant information resides, what it contains, and how the systems relate to one another.

**V. This Court Disapproved of Defendant's Approach In Prior Ride-Share Litigation Rulings.** This Court recently commented on and disapproved of an approach similar to Lyft's on non-custodial source discovery. In *In re Uber Technologies, Inc. Passenger Sexual Assault Litigation,* MDL No. 3084 (N.D. Cal.), the Court addressed Plaintiffs' concern regarding Defendant's failure to fully identify and produce relevant company policies and procedures. This Court noted in its ruling that defendant's conduct had created "a piece-meal process that places the burden on Plaintiffs to identify particular policies and related operational protocols for production." The Court therefore ordered that defendant produce "a declaration that explains, over the life of the company, where and how its policies and operational procedures have been stored, and producing the entirety of its current and historical repositories for policies and procedures, perhaps with a limited number of policies that are both highly sensitive and irrelevant to this litigation withheld. Then Plaintiffs can simply review those repositories to locate the relevant procedures and protocols." Dkt. #1996, at 2-3.

Similarly, in another *Uber* discovery hearing, this Court noted that the location of non-custodial data sources was an obvious candidate for early and specific disclosure to Plaintiffs, directing defendant to "provide the index and the list or the table of contents or whatever is necessary for plaintiffs to be able to participate in the identification of relevant policies as opposed to relying on Uber's just unilateral decision-making about what's relevant or having to rely on search terms…". *Id.* at 28:20-24.

Lyft's attempt to distinguish the Uber rulings is unpersuasive. Plaintiffs do not contend that those rulings independently govern Lyft's obligations. Rather, they illustrate the same concern presented here: requiring Plaintiffs to identify relevant company information through piecemeal requests while Defendant controls access to the underlying repositories. Plaintiffs request that the Court review the current state of non-custodial source disclosure in the same vein as was done in *Uber*, so that discovery can proceed as scheduled.

**VI. Lyft's Obstructionist Approach Hinders the Discovery Process.** Lyft has continued to withhold critical discovery from Plaintiffs unless and until it is forced to comply. This is antithetical to the discovery process and impedes the timely schedule set by this Court. The identification and description of non-custodial sources is basic company information that Lyft was required to disclose pursuant to Court order. Plaintiffs accordingly request the Court's intervention.

## Lyft's Position

***Lyft Satisfied the Court's Orders on Disclosure of Non-Custodial Sources.*** Lyft has complied with the Court's directions regarding non-custodial sources. The ESI order requires that Lyft disclose the names of custodial and non-custodial sources it believes likely to contain potentially relevant ESI, and the information each includes. (PTO 19 ¶ 7.) Lyft has done so:

- On May 20, 2026, Lyft served its ESI Checklist Responses, identifying non-custodial systems to be preserved and explaining how each is collected.
- At Plaintiffs' request, Lyft supplemented that response two weeks later with specific system names and time frames of their use,[2] together with sources that may not be reasonably accessible.
- On June 25, 2026, Lyft filed a source-by-source chart responding to each subpart of the ESI protocol's Paragraph 7—the "chart" the Court requested at the June 23 hearing. (Hr'g Tr. (June 23, 2026), at 22:12–14.)
- On July 24, 2026 Lyft confirmed to Plaintiffs that it had disclosed the information Paragraph 7 contemplated.

Plaintiffs characterize the July 24 letter as "false," but it did exactly what Paragraph 7 required: it confirmed, subpart by subpart, the disclosures Lyft already had made. Lyft never has said its investigation was frozen in time; every disclosure expressly stated it reflected Lyft's then-current understanding and "remains subject to further investigation, supplementation, correction, and refinement." Supplementation is exactly what PTO 19's "iterative and cooperative" process contemplates. (PTO 19 ¶ 20(k).)

As the iterative process has progressed, Lyft has fielded many questions from Plaintiffs about its non-custodial sources. Lyft has identified its outsourced intake vendors and their roles, identified [redacted] Lyft walked Plaintiffs through ho [redacted] (and pointed Plaintiffs to the Bates ranges which reflect the production of same in the JCCP), and Lyft is now conferring with Plaintiffs about how [redacted]—the very conversation PTO 19 directs for proprietary platforms. (PTO 19, App'x 1, ¶ 13). Plaintiffs' assertion that their inquiries are met with "non-responses" cannot be squared with the record.

***Lyft Did Not Conceal*** [redacted] Plaintiffs criticize Lyft for supposedly hiding two non-custodial data sources—[redacted] Incorrect. These are not non-custodial data sources. [redacted]

---

[2] For example, Lyft disclosed [redacted].

[redacted] Neither are non-custodial sources of data. Nor are Plaintiffs correct that they would not have been aware of this before late August, 2026; dozens of documents in the JCCP production discussed both [redacted]

Although these facts dispose of Plaintiffs' argument about [redacted], they are a bit beside the point. Plaintiffs' real interest is [redacted] process, and the parties are actively conferring about it. Lyft has told Plaintiffs it is investigating whether and how this massive volume of data can be queried and exported, so that the parties can discuss the scope, timing, and logistics of the production. Indeed, the parties continue to confer about these matters (again belying the suggestion that Lyft is non-responsive). To that end, on October 20, 2026, Plaintiffs promised to provide information about how the data will be hosted or reviewed, and under what security measures, given its highly sensitive nature. Lyft awaits their position.

Other alleged "deficienc[ies]" Plaintiffs identify are the subject of active conversations among the parties about, for example, the [redacted] None has been the subject of a refusal by Lyft, and there is no impasse. Plaintiffs' statements on the parties' October 20 conference—that they wanted to discuss "safety data, exports from other databases, and information from other NCDS outstanding from August"—confirm that the parties' discussions remain open.

***Plaintiffs' Requested Relief Is Improper.*** Plaintiffs ask the Court to order, within three days and under oath, a "complete list of all" non-custodial sources and production of "all documents" that could identify or locate non-custodial material. But there is no free-floating obligation for Lyft to produce every file inventory or folder naming a potential non-custodial data source, especially those that contain information entirely unrelated to the subject matter of this litigation. The ESI protocol directs the parties to confer about structured data, available fields, and schema, and to proceed iteratively. (PTO 19 ¶ 3 & App'x 1 ¶ 12.)[3] Lyft has been doing this.

Plaintiffs' follow-on demand for a sanctions admonition under Federal Rule 37(b)(2)—absent any violation of any order—is unwarranted and inconsistent with that Rule. Indeed, it is the very thing for which Plaintiffs have chastised Uber in their MDL proceeding: "creating a conflict where none ought to exist, infusing it with apocalyptic-sounding adjectives, and seeking sanctions without meaningfully conferring with opposing counsel." *In re Uber*, 23-md-3084 (N.D. Cal. May 6, 2026), Dkt. 6120 at 23-25 (cleaned up).

***The Process Yielding this Submission Was Improper.*** Plaintiffs served the position statement that found its way into this submission at 9:23 a.m. PT on October 20, 2026—37 minutes *before* the parties' scheduled 10:00 a.m. PT videoconference on the very issues Plaintiffs included in the statement. Plaintiffs' counsel opened that videoconference by offering that "if we can't reach agreement very soon," Plaintiffs would go to the Court—an acknowledgment the parties

[3] The *Uber* rulings Plaintiffs cite addressed a defendant's identification of policy repositories on the record in that case; they do not establish that Lyft has failed to comply with any order here, and the Court has made clear that *Uber* is a point of reference, not a template.

were not yet at an impasse. And at the conference, the parties worked through the substance, with each side agreeing to undertake further work. (Among other things, for example, Plaintiffs agreed to provide a proposal on data-security parameters for production of safety data.) Hours later, however, Plaintiffs purported to "confirm" they would "move forward with this PTO 18 submission" (although they then agreed to participate in another conference on these issues on October 22).

Yet that was not the end of the rigmarole. On October 22, Plaintiffs suggested the parties proceed by continuing to meet and confer on October 23 and that Plaintiffs would advise Lyft whether they intended to modify their October 20 draft PTO 18 letter. Lyft understood, as memorialized in email on October 22 that: "In the event Plaintiffs intend to stand on one or both of their 10/20 drafts, we will provide Lyft's response to the unchanged draft(s) within 3 business days of tomorrow. In the event Plaintiffs modify one or both drafts, Lyft will have 3 business days from receipt of the modified version to respond."

The next day, Plaintiffs sought to impose three different, inconsistent approaches on Lyft. (Lyft Ex. A.) Despite meeting and conferring for an hour and a half on October 23, Plaintiffs waited until 3:08 pm PT to send a single missive: "In accordance with the PTO 18 schedule and our related correspondence, we expect to receive your position of this statement today." Then, Aimee Wagstaff, who has not attended any of the parties' meet and confer discussions, claimed in rapid succession that Plaintiffs would be filing their PTO 18 statement by 8:00 pm PT that evening (October 23) and then claimed that they would be filing their statement tomorrow (October 24) at 3:45 pm PT, inviting Lyft to contact her to discuss and then not answering or calling Lyft back after its counsel attempted to contact Ms. Wagstaff. (Lyft Ex. B.)

The specifics of Plaintiffs' moving target of a purported PTO 18 process almost do not matter; none are consistent with PTO 18. The parties must first confer in person or by videoconference. (PTO 18 ¶¶ 2–3.) Only "[i]f the parties remain at an impasse after conferring" may the moving party initiate the joint letter process, and even then it may proffer its portion "no earlier than three business days after the parties have finished conferring." (PTO 18 ¶ 4.) As detailed, Plaintiffs did not do this. A dispute "presented in a manner contrary to the provisions in this Order may be stricken from the record." (PTO 18 ¶ 8.) That relief is warranted here.

Plaintiffs, of course, are free to bring whatever real or imagined disputes they want to the Court. But they have to do so consistent with PTO 18; they do not get to create their own procedures and then demand that Lyft abide by them.

***Plaintiffs' exhibits and supporting declaration are improper.*** It is not simply that the process yielding this submission was improper; Plaintiffs' insert is as well. It includes an 11-page, 51-paragraph declaration, not provided to Lyft with Plaintiffs' original draft and provided to Lyft for the first time less than two hours before the filing deadline. The declaration's description of the parties' meet and confer process up to this point is misleading, and Lyft has not had meaningful opportunity to respond under the PTO 18 exchange schedule. (And as far as Lyft can discern, there is no reason that the declaration itself—and the substance of it—could not have been provided to Lyft earlier.) Lyft noted its objections to the filing of Ms. Ellis's declaration to Plaintiffs, who have elected to file it anyway. Its inclusion underscores Lyft's concerns regarding Plaintiffs' failure to follow the requirements of PTO 18.

## SIGNATURE ATTESTATION

I hereby attest that I am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 4-1(i)(3), I attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

Date: October 26, 2026

Respectfully submitted,

**WAGSTAFF LAW FIRM**

**By:** */s/ Aimee Wagstaff*
Aimee Wagstaff, Esq.

*Counsel for Plaintiffs*